# EXHIBIT B

Filed
D.C. Superior Court
02/29/2016 12:18PM
Clerk of the Court

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

| | |
|---|---|
| Melissa Dornan<br>3463 Godspeed Road<br>Davidsonville, MD 21035<br><br>       **Plaintiff,**<br><br>       v.<br><br>**Capital One Services, LLC**<br>1700 K Street NW<br>Washington, D.C. 20006<br><br>  Serve On:<br>  Corporation Service Company, Resident Agent<br>  1090 Vermont Avenue, NW<br>  Washington, D.C. 20005<br><br>and<br><br>**Capital One Financial Corporation**<br>1680 Capital One Drive<br>McLean, Virginia 22102<br><br>  Serve On:<br>  Corporation Service Company, Resident Agent<br>  2711 Centerville Road, Suite 400<br>  Wilmington, Delaware 19808<br><br>and<br><br>**Capital One, N.A.**<br>1680 Capital One Drive<br>McLean, Virginia 22102<br><br>  Serve On:<br>  Corporation Service Company, Resident Agent<br>  2711 Centerville Road, Suite 400<br>  Wilmington, Delaware 19808<br><br>       **Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)      Civil Action No.  2016 CA 001269 B |

**COMPLAINT AND JURY DEMAND**

Plaintiff Melissa Dornan ("Ms. Dornan" or "Plaintiff"), by and through counsel, hereby

moves this Court for Judgment against Defendant Capital One Services, LLC, Capital One Financial

Corporation, and Capital One, N.A. (collectively, "Capital One" or "Defendant"), and in support thereof, states as follows:

## I.     PARTIES

1.      Plaintiff is a female who, since April 1, 2015, resides at 3463 Godspeed Road, Davidsonville, Maryland 21035, and is a resident of the State of Maryland. From July 2014 through March 2015, Ms. Dornan resided at 1910 Towne Center Boulevard, #616, Annapolis, Maryland 21401. At all relevant times prior to July 2014, Ms. Dornan resided at 4102 46th Street, NW, Washington, D.C. 20016, and was a resident of the District of Columbia. Ms. Dornan performed work for Capital One from September 4, 2012, through September 4, 2013, at its office located at 20501 Seneca Meadow Parkway, Germantown, Maryland 20876; and then worked at Capital One's Washington, D.C. office located at 1700 K Street, NW from September 4, 2013, until her termination on October 8, 2014.

2.      Defendants Capital One Financial Corporation and Capital One, N.A. are Delaware corporations with their principal place of business in McLean, Virginia. Defendant Capital One Services, LLC is a limited liability corporation whose only member is Capital One, N.A., and it therefore is a citizen of Delaware and Virginia. Capital One does business in the District of Columbia. Capital One is and at all times mentioned herein was an employer within the meaning of Title VII of the Civil Rights Act of 1964 ("Title VII") and the District of Columbia Human Rights Act of 1977 ("DCHRA").

## II.     JURISDICTION

3.      Venue is proper as the acts complained of herein occurred in the District of Columbia.

2

4.  Ms. Dornan filed a charge of discrimination against Capital One with the U.S. Equal Employment Opportunity Commission ("EEOC") and with the District of Columbia Office of Human Rights ("DCOHR") on or about February 16, 2015, complaining of the acts of discrimination and retaliation alleged herein.

5.  On August 7, 2015, the DCOHR administratively dismissed Ms. Dornan's complaint for lack of jurisdiction because she filed a complaint with the EEOC.  On or about November 30, 2015, more than 180 days having elapsed since the filing of her EEOC charge, the EEOC issued Plaintiff a notice of her right to sue Defendant.

6.  Plaintiff has complied fully with all prerequisites to jurisdiction in the Court under Title VII and the DCHRA.

7.  Ms. Dornan is not of aware of entering into any agreement to arbitrate the claims set forth in this charge.

### III.  FACTS GIVING RISE TO RELIEF

**A.  Capital One Wrongfully Terminated Ms. Dornan.**

**i.  Ms. Dornan was Subjected to a Hostile Work Environment.**

8.  Capital One subjected Ms. Dornan to a hostile work environment that unreasonably interfered with her job performance and created an intimidating, hostile, and offensive work atmosphere.

9.  Ms. Dornan began working for Capital One as a District Manager II on September 4, 2012.  As a District Manager II, Ms. Dornan's job responsibilities included leading teams of retail branches and coaching branch managers, along with serving as a mentor to other district managers.

10.     While Ms. Dornan generally worked from her office in Washington, D.C., on December 9, 2013, she was working in the huddle room at Capital One's headquarters in McLean, Virginia. Multiple times throughout the day, James Dolphin ("Mr. Dolphin"), Chief Information Officer, Capital One Financial Corporation, knocked on the window and smiled and waved at Ms. Dornan. While Ms. Dornan knew who Mr. Dolphin was and had exchanged a cordial hello in passing at the office or corporate events, she had no professional or personal relationship with him, and did not understand why he was overtly knocking on the window and waving at her throughout the day. His actions made her uncomfortable and put her on guard. On one occasion, Mr. Dolphin opened the huddle room door to say hello and asked Ms. Dornan to drop by his office before the end of the day. At approximately 5:00 pm, Ms. Dornan went to Mr. Dolphin's office. The two discussed Ms. Dornan's team, and Mr. Dolphin recommended that he conduct focus groups on information technology matters on branch visits in Washington, D.C. with Ms. Dornan's team. Ms. Dornan was relieved that Mr. Dolphin had only wanted to discuss business with her.

11.     The following day, December 10, 2013, Ms. Dornan sent Mr. Dolphin a thank you email and informed him that she would contact his administrative assistant to schedule branch visits per their conversation. Soon after Ms. Dornan sent the email, Mr. Dolphin called Ms. Dornan on her work cell phone and asked to meet her for a holiday drink before Christmas. Ms. Dornan assumed the purpose of meeting for a drink was to discuss the pending branch visits.

12.     On or around December 18 or 19, 2013, Ms. Dornan arranged to meet Mr. Dolphin around 5/5:30 pm at Kellari Taverna, which is located next door to her Washington, D.C. office. However, Mr. Dolphin emailed Ms. Dornan and said that he would be coming directly from a work

4

meeting and could not meet until after 7:00 pm. Accordingly, they did not meet until approximately 7/8:00 pm. After two drinks, Mr. Dolphin asked Ms. Dornan if she would like a third drink, but she declined. During the meeting, Ms. Dornan and Mr. Dolphin discussed work and their personal backgrounds. At one point, Mr. Dolphin placed his hand on Ms. Dornan's arm. Taken aback, Ms. Dornan gave Mr. Dolphin an unsettling look, and Mr. Dolphin, taking note, quickly asked if his gesture made her uncomfortable. Ms. Dornan responded, "Yes." Mr. Dolphin appeared surprised by Ms. Dornan's response and removed his hand. The two continued their conversation. Mr. Dolphin then asked if Ms. Dornan would like to go to another restaurant or bar, but Ms. Dornan declined. Leaving the restaurant, Mr. Dolphin leaned in to give what Ms. Dornan thought was a kiss on the check goodbye, but turned out to be a kiss directly on her lips. Shocked and unnerved by Mr. Dolphin's kiss on her lips, Ms. Dornan immediately turned away and walked to the parking garage alone.

13.    The next morning, Mr. Dolphin sent Ms. Dornan a text message on her work cell phone asking for her personal cell phone number. Ms. Dornan texted him back and, politely thanking him, said that she wanted to keep their relationship professional and hoped that he would understand. Mr. Dolphin responded that he did understand and thanked Ms. Dornan for being "an adult."

14.    Ms. Dornan genuinely hoped that the situation had been put to an end and that Mr. Dolphin would take no further actions towards her. However, feeling apprehensive, Ms. Dornan notified her boss, George Swygert ("Mr. Swygert"), Regional Executive, Capital One, about the situation. Upon hearing the story, Mr. Swygert was upset with Mr. Dolphin's harassing behavior and

said something to the effect that "Americans do things different than in Europe," and called Mr. Dolphin (who is European) a sleaze. Mr. Swygert asked Ms. Dornan what she wanted him to do and asked her what support she needed. Ms. Dornan told Mr. Swygert that she felt like she had taken care of the situation, and said she hoped that it would not happen again. Mr. Swygert took no further action other than checking in with Ms. Dornan approximately two to three times from early- to mid-2014, to ask if Mr. Dolphin had hit on her again. As nothing had happened during that period of time, Ms. Dornan responded in the negative each time.

15.     While Ms. Dornan had hoped that the matter was resolved, she nevertheless felt uncomfortable as a result of Mr. Dolphin's sexual advances. Henceforth, when at Capital One's headquarters, Ms. Dornan avoided Mr. Dolphin's side of the eighth floor, which was a major inconvenience for her as that was the same floor that her administrative assistant, Melissa Ashby, and her boss, Mr. Swygert, had offices. Ms. Dornan had inadvertently seen Mr. Dolphin from time to time at corporate events, but everything remained cordial, and the two were never alone together.

16.     However, on August 29, 2014, Ms. Dornan was in the hallway of the eighth floor of Capital One headquarters doing business when Mr. Dolphin spotted her and approached her. The two discussed their individual plans for the upcoming Labor Day weekend. A few hours later, Mr. Dolphin left Ms. Dornan a voicemail on her work cell phone asking her to return his phone call. Ms. Dornan called him back that day, and Mr. Dolphin said that he felt like there was some "unsettled business between them." Ms. Dornan thought he was referring to the branch visits, which had never occurred. However, when Ms. Dornan asked what he meant by "unsettled business," she was stunned when he responded that he thought there was something between them and asked to take her

on a dinner date. Ms. Dornan declined and again stressed that she wanted to keep things between them professional, especially since they worked for the same company. Ms. Dornan further stated that she felt like her job would be at jeopardy. Mr. Dolphin jokingly asked if Ms. Dornan would reconsider if he was a spy and not really a Capital One employee. Completely uncomfortable with the conversation, Ms. Dornan nervously laughed and told Mr. Dolphin that they both knew that was not the situation and declined. Mr. Dolphin then asked if Ms. Dornan would accompany him to the City Year Event on September 17, 2014. Ms. Dornan said that she would need to check her calendar and may consider attending, but only as a colleague, not a date. Mr. Dolphin said that he would send Ms. Dornan the details via email and that if she changed her mind regarding the "date," to let him know. Mr. Dolphin sent Ms. Dornan an email with the information, but she never replied.

17.     Unable to tolerate Mr. Dolphin's unwelcome, sexual advances and the hostile work environment created as a result any longer, Ms. Dornan texted Mr. Swygert on August 30, 2014, and asked him to call her so she could inform Mr. Swygert about Mr. Dolphin's harassing behavior. On September 2, 2014, Mr. Swygert telephoned Ms. Dornan, and Ms. Dornan told him what occurred with Mr. Dolphin. Mr. Swygert said that he would contact Associate Relations and create a case.

18.     On September 4, 2014, an Associate Relations representative contacted Ms. Dornan via telephone, and they discussed Mr. Dolphin's harassing behavior and the incidents detailed above. When the representative realized that Mr. Dolphin is an executive with Capital One, she said that she would need to reassign the case to a different Associate Relations representative who is responsible for executive-level cases.

7

19.     Within one week from September 4, 2013, another Associate Relations representative responsible for executive-level cases contacted Ms. Dornan to discuss the case.  After their phone call, Ms. Dornan provided the representative with copies of text messages and emails that she received from Mr. Dolphin.

20.     In mid- to late-September, the Associate Relations representative contacted Ms. Dornan and said that he had spoken with Mr. Dolphin and that nothing would happen again

ii.     **Capital One Retaliated Against Ms. Dornan for her Complaints of Harassment.**

21.     Instead of properly investigating Ms. Dornan's complaint, Capital One retaliated against Ms. Dornan and terminated her.  On October 7, 2014, Ms. Dornan received a phone call from Mr. Swygert's assistant requesting that Ms. Dornan meet Mr. Swygert at his office at 1:00 pm on October 8, 2014. Jokingly, Ms. Dornan asked if she was being terminated.  The assistant responded that she did not know.  Shocked, Ms. Dornan said that she was just joking and asked what the meeting was about.  The assistant said that she did not know and that it was probably just standard business.  That night, Ms. Dornan thought about it and assumed the meeting was to discuss a recent "power day" that she had attended.  When Ms. Dornan arrived at Mr. Swygert's office on October 8, 2014, she was directed to an office on the second level where she met with Mr. Swygert and Jennifer Cyrus, Human Resources ("HR") Client Consulting, Capital One. Mr. Swygert told Ms. Dornan that she was being terminated effective that day.  Ms. Dornan asked why she was being terminated, and Mr. Swygert said that he could not provide any specifics.

22.     Confused, Ms. Dornan continued to call Mr. Swygert and ask why she was terminated.  On or around October 20, 2014, Ms. Dornan spoke on the phone with Heather Hodges

("Ms. Hodges") from Capital One. Ms. Dornan again asked why she was terminated. Ms. Hodges

said that she could not tell Ms. Dornan for liability purposes. Ms. Dornan asked if it was because of

the branch manager complaints.[1]  Ms. Hodges responded, "Basically." As discussed below, that

reason is a pretext. Capital One terminated Ms. Dornan's employment in retaliation for filing a

sexual harassment complaint against Mr. Dolphin.

    iii.    <u>Any Allegations of a Legitimate Reason for the Termination are Pretextual.</u>

        a.    **Ms. Dornan's record clearly demonstrates satisfactory
performance during her employment at Capital One.**

    23.    While Capital One may try to argue that Ms. Dornan's termination was the result of

negative performance, the facts establish that any criticism of Ms. Dornan's performance is

pretextual. The reason for Ms. Dornan's termination was the result of Capital One retaliating against

her for reporting Mr. Dolphin's harassing behavior. Ms. Dornan received all positive performance

assessments during her employment with Capital One. Specifically, in Ms. Dornan's most recent

annual performance evaluation (received January 2014), she received a 4 out of 5 rating, and was the

highest ranked district manager under Mr. Swygert (first out of the nine district managers under Mr.

Swygert). During her tenure at Capital One, Ms. Dornan has never received a negative performance

evaluation and, prior to the termination at issue herein, she never received any kind of disciplinary

action.

    24.    Furthermore, Ms. Dornan's accomplishments at Capital One demonstrate that her

performance was clearly satisfactory. For example, upon arriving at Capital One, Ms. Dornan was

---

1 *See, infra*, Section III(A)(iii)(b), at ¶¶ 29-34 (discussing branch manager complaints).

placed in charge of District 2 (Gaithersburg/North Rockville). Under her lead, District 2 ranked first in the April 2013 associate engagement surveys. District 2 had an "engaged" score of 83%, which was a jump from the previous year's score of 70%, a direct reflection of Ms. Dornan's leadership abilities. Furthermore, District 2 went from being ranked 21st in key performance indicators to being ranked third with Ms. Dornan as its District Manager. At the end of her tenure as District Manager of District 2 in September 2013, District 2 was the highest ranked district overall of the nine districts under Mr. Swygert. As Ms. Dornan's team was the best operational performing team under Mr. Swygert, Ms. Dornan was meeting, and more likely exceeding, Capital One's expectations of her performance.

25.     As of September 2013, the worst performing district under Mr. Swygert was District 10 (Downtown DC). Mr. Swygert presented Ms. Dornan with the opportunity to lead the District 10 and help turn around its performance. Being a team player, Ms. Dornan immediately accepted the challenge and switched to District Manager of District 10 in September 2013. Mr. Swygert was clearly confident in Ms. Dornan's professional capabilities as he noted at the bottom of Ms. Dornan's September 2013 Region IV Banking Offices, Downtown Washington DC Monthly Report, "Melissa, You have to start somewhere. Team in place first and results will follow. I'm glad you are in DC. Thank you! George[.]"

26.     At the time Ms. Dornan took charge of District 10, it had the lowest associate engagement scores. it was the worst performing team under Mr. Swygert on all key performance indicators, it was ranked 61st out of 63 teams nationwide, and it had the lowest operational audit percentage of any of Mr. Swygert's districts (89% average audit rating). Ms. Dornan quickly turned

10

things around.  In October 2013, District 10 hit six out of eight key performance indicators - a number it had been unable to achieve prior to Ms. Dornan's arrival on the team.  Mr. Swygert praised Ms. Dornan's performance in his notes on her monthly statistics printout, "Best month this year! Love it[.]"  As a direct result of Ms. Dornan's remarkable performance as District Manager of District 10, that district ranked first in the April 2014 associate engagement survey scores (its "engaged" percentage went from a 76% in the year prior to Ms. Dornan taking charge to a score of 85% in 2014); and, as of the date that Ms. Dornan was terminated (October 8, 2014), District 10 ranked 20th out of 63 teams nationwide; and its operational audit average rating jumped to 94%. Contrary to Capital One's allegations, the record demonstrates that, *at a minimum*, Ms. Dornan's performance was satisfactory.

27.     In addition, Ms. Dornan's raise and bonus history demonstrates her satisfactory performance record at Capital One.  Ms. Dornan was hired at a salary of $145,000.00 with a $20,000.00 sign-on bonus. In March 2013, she received a bonus of $20,000.00 and also a $3,000.00 Long Term Incentive ("LTI") payment. In February 2014, Ms. Dornan was given a notable bonus of approximately $45,000.00 and stock option worth approximately $20,000.00 (which she never received the proceeds of since her stock options did not vest prior to her wrongful termination).  At that time, Ms. Dornan was also given a $4,000.00 raise, bringing her annual salary to $149,000.00.

28.     Moreover, Ms. Dornan received numerous awards and certificates over her tenure at Capital One, which also demonstrates her satisfactory performance.  For example, Ms. Dornan received:

- Certificate of Achievement for Top Consumer Checking production for Month of September 2012

- Certificate of Achievement for Top BUR Score for Month of September 2012

- Certificate of Achievement for Top Consumer Checking production for Month of January 2013

- Certificate of Achievement for Top SB Checking production for Month of January 2013

- Certificate of Achievement for Top BAR Score for Month of January 2013

- Certificate of Achievement for Top KPI Score for Month of January 2013

- Certificate of Achievement for Top KPI Score for Month of February 2013

- Certificate of Achievement for Top SB Checking production for Month of February 2013

- Team DCMD Spirit Award for efforts in leading the team with TranSend April 2013

- Certificate of Achievement for Top SB Checking production for Month of April 2013

- Certificate of Achievement for Top SB Engagement Score YTD April 2013

- Certificate of Achievement for Top KPI Score for Month of July 2013

- Certificate of Achievement for Top SB Engagement Score YTD July 2013

- Team DCMD Spirit Award for being a great team player July 2013

- Certificate of Achievement for Top Production in Credit Cards August 2013

- Certificate of Achievement for Top Production in KPIs August 2013

- Certificate of Achievement for Top Production in Home Equity August 2013

- Certificate of Achievement for Top CEMP Score for Month of December 2013

12

- Certificate of Excellence for outstanding performance and significant contributions to the MD East/Greater Annapolis District Peer Award circa April/May 2014

     **b.**    **The branch manager complaints against Ms. Dornan fail to establish unsatisfactory performance on Ms. Dornan's part.**

29.    It appears that a few of Ms. Dornan's branch managers lodged complaints against her.

To Ms. Dornan's knowledge, only the following complaints were made against her:

- In October 2013, Randall Patterson ("Mr. Patterson") complained to Mr. Swygert that Ms. Dornan used the words "piss poor" to describe his performance.

- In February 2014, Mr. Patterson and Yolette Olufemi ("Ms. Olufemi") challenged the annual review ratings of "inconsistent" that Ms. Dornan had given to each of them. In addition to challenging her annual rating, Ms. Olufemi simultaneously lodged multiple management/discriminatory complaints against Ms. Dornan. Specifically, she alleged that: (1) Ms. Dornan committed a sexually offensive act back in December at an office party by performing the "worm;" (2) Ms. Dornan discriminated against her based on her age and ethnicity (Haitian) because Ms. Dornan would speak slowly to her; and (3) Ms. Dornan was unprofessional because she would use phrases such as, "You go, girl," in the office.

  After review by HR, Mr. Patterson's score remained "inconsistent." Because Ms. Dornan took charge of the DC office in September and the annual review scores were due in October, HR recommended that Ms. Dornan change Ms. Olufemi's score to "strong" as she did not have a long evaluation period prior to Ms. Olufemi's annual report being due. Ms. Dornan chose to accept HR's recommendation and, working with Kristen Parkinson ("Ms. Parkinson") of HR, changed Ms. Olufemi's annual review. While Ms. Dornan accepted HR's recommendation and changed the annual review score for Ms. Olufemi, there was no finding of wrongdoing on Ms. Dornan's part as to her original scoring.

  As for Ms. Olufemi's management/discrimination case, Ms. Dornan received a phone call from someone named "Keisha" with the Associate Relations department in or around February 2014, who was investigating the case. The phone call lasted approximately an hour and a half. In April 2014, Ms. Dornan received a phone call from Carolyn Lurie with Capital One stating that Capital One found no wrong doing on Ms. Dornan's part and that the case filed by Ms. Olufemi was closed.

While there was no wrongdoing on Ms. Dornan's part as to either Mr. Patterson or Ms. Olufemi, in or around late April/early May 2014, she nevertheless accepted Mr. Swygert's offer to have an executive coach assigned to her to help her learn to manage such personnel challenges. Ms. Dornan also accepted Ms. Parkinson's offer to sit in on future coaching sessions with Ms. Olufemi.

- In or around late July/early August 2014, Ms. Dornan received a phone call from HR asking about two cases that had been filed against her. The first case regarded how Ms. Dornan coaches employees on professional attire. The HR representative would not tell Ms. Dornan who filed the complaint or what was specifically said about Ms. Dornan because Capital One wanted to avoid any retaliation claims. However, Ms. Dornan figured that it had to do with a conversation she had with Lisa Wallace ("Ms. Wallace"), back in December 2013. (While the conversation between Ms. Dornan and Ms. Wallace occurred in December 2013, the timing of Ms. Wallace's unwarranted complaint made sense to Ms. Dornan because Ms. Dornan had just placed Ms. Wallace under enhanced coaching, the first step of Capital One's progressive discipline system. Ms. Wallace was the worst performing Capital One branch manager in the nation (ranked 859 out of 859).) In the conversation with Ms. Wallace, Ms. Dornan provided no instruction to Ms. Wallace, and simply told Ms. Wallace a personal story about her career. Specifically, Ms. Dornan told Ms. Wallace that when she was 25 years old and a vice-president at Wachovia, she was told by her male boss to "skirt up," meaning that she should wear a skirt, heels and her hair down. Otherwise, her boss said that she looked like a "lesbian." Ms. Dornan told Ms. Wallace that she had confronted several challenges dealing with that boss, and that her personal views on business attire were greatly impacted by that experience. At no point in the conversation did Ms. Dornan ever instruct or advise Ms. Wallace as to what she should wear professionally. Ms. Dornan simply shared a personal story about her career with a colleague.

- The HR representative next asked Ms. Dornan if she ever informed an employee about another employee's surgery. Ms. Dornan responded that she had told Jessica Taylor's ("Ms. Taylor's") boss that Ms. Taylor was donating a kidney so that the boss could send a card to Ms. Taylor.

After the phone call with the HR representative, Ms. Dornan heard nothing further about these two cases.

14

30.     While the few branch managers listed above complained about Ms. Dornan, many

lauded her.  As just one example, one of her old branch managers, Michael Ellison, emailed Ms.

Dornan on November 5, 2013:

> Hi Melissa,
>
> Just wanted to thank you for all that you did to help me, I'm happy to
> report that I will be 7/8 KPI for October and 8/8 KPI YTD for
> October.  I'm working smarter not harder and I've been holding my
> associates accountable even though it is still a work in progress.  I
> hope all is well with you and your new district and I will keep in
> touch.  Thanks again for challenging me.

31.     In addition, Capital One itself found some of the above allegations against Ms.

Dornan to be groundless after an investigation.

32.     In any event, none of the above complaints justify any action be taken against Ms.

Dornan.

33.     Even assuming *arguendo*, that any of the allegations against Ms. Dornan were true

and that Ms. Dornan's alleged actions violated Capital One policy, such incidents did not warrant

termination pursuant to Capital One's progressive discipline system.  Ms. Dornan never received any

disciplinary action at Capital One prior to the termination.  None of the incidents listed above – or

even taken together -- merits a jump in discipline steps to the severe penalty of termination.

Furthermore, in light of Ms. Dornan's stellar performance as a District Manager at Capital One, none

of the alleged complaints listed above warrants her termination with a Uniform Termination Notice

for Securities Industry Registration ("Form U-5") for "unsatisfactory performance."

15

34.     Indeed, the temporal proximity (*i.e.*, the timing between Ms. Dornan's reporting of Mr. Dolphin's harassing behavior and her termination) is *prima facie* evidence in this matter that Capital One's purported reasons for Ms. Dornan's termination are pretextual. After the phone call from HR in late July/early August 2014, Ms. Dornan heard nothing further from Capital One about any branch manager complaints. Meanwhile, Ms. Dornan filed a sexual harassment complaint against Mr. Dolphin on September 4, 2014. Less than one month later (while Capital One did not officially terminate Ms. Dornan until October 8, 2014, it appears that it internally made the decision at least as early as October 3, 2014, as that is the date of Ms. Dornan's Letter of Agreement outlining the terms of her termination from Capital One), Capital One decided to terminate Ms. Dornan with a Form U-5 stating that the termination is for "unsatisfactory performance." Capital One clearly terminated Ms. Dornan in retaliation for reporting Mr. Dolphin's harassing behavior.

35.     As a result of the harassment and retaliation against Ms. Dornan, Ms. Dornan has experienced stress and feels ashamed.

**iv.     Capital One further Retaliated against
Ms. Dornan by Defaming her in a Form U-5.**

36.     In a further effort to retaliate against Ms. Dornan by making her transition to another employer more difficult, Capital One submitted a false and defamatory reason for Ms. Dornan's termination in a Form U-5.

37.     As a Financial Industry Regulatory Authority, Inc. ("FINRA") member firm, Capital One is obligated to file with that self-regulated organization, a FINRA Form U-5 upon the termination of any financial advisor employed by the firm. If the advisor was terminated for any

16

reason except voluntary termination/resignation, the firm is required to state a reason for the termination. The Form U-5 is a public record, and future employers contemplating hiring an advisor rely on the Form's accuracy when making a decision to hire.

38.     After Capital One terminated Ms. Dornan, it caused to be placed on Ms. Dornan's Form U-5 as reason for termination "other, unsatisfactory performance – non-securities related." This malicious statement is patently untrue. Ms. Dornan was not terminated for unsatisfactory performance. To the contrary, her track record reveals that her performance at Capital One was clearly satisfactory. As a result of these patently false and outrageous allegations, Ms. Dornan's reputation has been damaged.

39.     Capital One intentionally, willfully, and wantonly retaliated against Ms. Dornan in violation of Title VII and the Human Rights Act of 1977.

40.     As a result of Capital One's actions, Ms. Dornan has suffered irreparable injuries, including but not limited to loss of pay, benefits and other economic losses, emotional pain and suffering, mental anguish, humiliation, embarrassment, personal indignity and other intangible injuries.

## V.     CLAIMS FOR RELIEF

### COUNT I
### (Violations of the DCHRA)

41.     Plaintiff repeats and incorporates by reference all of the foregoing allegations into this claim of this Complaint as if they were set forth in full.

42.     Defendant retaliated against Plaintiff and terminated her employment on the basis of

her having complained of discrimination, in violation of the DCHRA.

43.    In addition, Defendant retaliated against and defamed her on a Form U-5 on the basis of her having complained of discrimination, in violation of the DCHRA.

44.    Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendant's retaliatory practices unless and until this Court grants relief.

WHEREFORE, Plaintiff requests that this Court enter a judgment:

a.    Declaring that the acts and practices complained of herein are in violation of the DCHRA;

b.    Enjoining and permanently restraining these violations of the DCHRA;

c.    Directing Defendant to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect Plaintiff's employment opportunities;

d.    Directing Defendant to place Plaintiff in the position she would have occupied but for Defendant's retaliatory treatment of her, and make her whole for all earnings she would have received but for Defendant's retaliatory treatment, including, but not limited to, wages, pension, and other lost benefits;

e.    Awarding Plaintiff compensatory and punitive damages;

f.    Awarding Plaintiff the costs of this action together with reasonable attorneys' fees, as provided by the DCHRA;

g.    Directing Defendant to pay Plaintiff compensatory damages and damages for her mental anguish and humiliation; and

18

h.    For any and all other equitable and legal relief to which Plaintiff appears entitled.

## COUNT II
### (Violations of Title VII)

45.    Plaintiff repeats and incorporates by reference all of the foregoing allegations into this claim of this Complaint as if they were set forth in full.

46.    Defendant retaliated against Plaintiff and terminated her employment on the basis of her having complained of discrimination, in violation of Title VII.

47.    In addition, Defendant retaliated against and defamed her on a Form U-5 on the basis of her having complained of discrimination, in violation of Title VII.

48.    Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendant's retaliatory practices unless and until this Court grants relief.

WHEREFORE, Plaintiff requests that this Court enter a judgment:

a.    Declaring that the acts and practices complained of herein are in violation of Title VII;

b.    Enjoining and permanently restraining these violations of Title VII;

c.    Directing Defendant to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect Plaintiff's employment opportunities;

d.    Directing Defendant to place Plaintiff in the position she would have occupied but for Defendant's retaliatory treatment of her, and make her whole for all earnings she would have

received but for Defendant's retaliatory treatment, including, but not limited to, wages, pension, and other lost benefits;

      e.    Awarding Plaintiff compensatory and punitive damages;

      f.    Awarding Plaintiff the costs of this action together with reasonable attorneys' fees, as provided by Section 706(k) of Title VII, 42 U.S.C. Section 2000e-6(k);

      g.    Directing Defendant to pay Plaintiff compensatory damages and damages for her mental anguish and humiliation; and

      h.    For any and all other equitable and legal relief to which Plaintiff appears entitled.

## COUNT III
### (Libel)

49.    Plaintiff repeats and incorporates by reference all of the foregoing allegations into this claim of this Complaint as if they were set forth in full.

50.    Capital One's allegations on Plaintiff's Form U-5 are false and defamatory and were made with actual malice by Defendant's agents.

51.    Ms. Dornan was not terminated for "other, unsatisfactory performance – non-securities related." To the contrary, her track record reveals that her performance at Capital One was clearly satisfactory.

52.    Capital One's reason for her termination was a pretext, and the true reason was in retaliation against Plaintiff for reporting Mr. Dolphin's harassing behavior.

53.    Capital One and its agents and employees committed the acts described in this

Complaint intentionally, oppressively, fraudulently, and maliciously, entitling Ms. Dornan to an award of punitive damages, and to preclude a defense of privilege, the libel having been committed in the furtherance of gender discrimination and retaliation contrary to public law.

WHEREFORE, Plaintiff requests that this Court enter a judgment:

a.    Awarding back pay, front pay, and lost benefits;

b.    Awarding compensatory damages;

c.    Awarding punitive damages;

d.    Awarding pre- and post-judgment interest;

e.    Awarding prevailing party attorneys' fees and costs;

f.    Ordering expungement of the entry from Plaintiff's Form U5, and replacement of the offending language with "Discharged without cause;" and.

g.    For any and all other equitable and legal relief to which Plaintiff appears entitled.

## COUNT IV
### (Injunction)

54.    Plaintiff repeats and incorporates by reference all of the foregoing allegations into this claim of this Complaint as if they were set forth in full.

55.    As demonstrated by Ms. Dornan's excellent track record at Capital One, she was not terminated for "other, unsatisfactory performance – non-securities related." Rather, she was terminated in retaliation for filing a sexual harassment complaint against Mr. Dolphin, and, in further retaliation, Capital One published false statements as to why Ms. Dornan was terminated on her

Form U-5.

56.     Capital One has caused Plaintiff to suffer economic loss due to the false and misleading information on her Form U-5, including but not limited to the denial of a prospective job opportunity as a result of the patently false statement on her Form U-5 that she was terminated for "other, unsatisfactory performance – non-securities related." Ms. Dornan will be irreparably injured absent expungement of the false information from her Form U-5.

WHEREFORE, Plaintiff requests that this Court enter a judgment:

a.     Ordering expungement of the entry from Plaintiff's Form U5, and replacement of the offending language with "Discharged without cause;" and

b.     For any and all other equitable and legal relief to which Plaintiff appears entitled.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues contained herein.

Respectfully submitted,

Joyce E. Smithey, Esq.
D.C. Bar Number 474004
Rifkin, Weiner, Livingston, Levitan & Silver, LLC
225 Duke of Gloucester Street
Annapolis, Maryland  21401
(410) 269-5066 (phone)
(410) 269-1235 (fax)
jsmithey@rwlls.com

Date: 2/17/16                    Attorney for Plaintiff Melissa Dornan

22

## VERIFICATION

I, Melissa Dornan, being duly sworn on oath, do hereby state that I have read the foregoing Complaint and that it is true to the best of my knowledge, information, and belief.

Melissa Dornan

Subscribed and sworn to before me
this _16_ day of February, 2016

Notary Public

My Commission Expires:

> JANET BLACK
> NOTARY PUBLIC
> Anne Arundel County
> MARYLAND
> MY COMMISSION EXPIRES NOV. 13, 2016

23

# Superior Court of the District of Columbia

## CIVIL DIVISION- CIVIL ACTIONS BRANCH
### INFORMATION SHEET

Melissa Dornan _____     Case Number: **2016 CA 001269 B**

vs

Date: _____

Capital One Services, LLC, et al. _____     ☐ One of the defendants is being sued in their official capacity.

| | |
|---|---|
| Name: *(Please Print)* <br> Joyce E. Smithey, Esq. <br> Firm Name: <br> Rifkin, Weiner, Livingston, Levitan & Silver, LLC <br> Telephone No.:        Six digit Unified Bar No.: <br> (410) 269-5066         474004 | Relationship to Lawsuit <br> ☒ Attorney for Plaintiff <br> ☐ Self (Pro Se) <br> ☐ Other: _____ |

TYPE OF CASE: ☐ Non-Jury     ☒ 6 Person Jury     ☐ 12 Person Jury

Demand: $ 1,565,795.00     Other: Injunctive Relief

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.: _____     Judge: _____     Calendar #: _____

Case No.: _____     Judge: _____     Calendar #: _____

NATURE OF SUIT:     *(Check One Box Only)*

### A. CONTRACTS

COLLECTION CASES

☐ 01 Breach of Contract
☐ 02 Breach of Warranty
☐ 06 Negotiable Instrument
☐ 07 Personal Property
☒ 13 Employment Discrimination
☐ 15 Special Education Fees

☐ 14 Under $25,000 Pltf. Grants Consent
☐ 17 OVER $25,000 Pltf. Grants Consent
☐ 27 Insurance/Subrogation
　　Over $25,000 Pltf. Grants Consent
☐ 07 Insurance/Subrogation
　　Under $25,000 Pltf. Grants Consent
☐ 28 Motion to Confirm Arbitration
　　Award (Collection Cases Only)

☐ 16 Under $25,000 Consent Denied
☐ 18 OVER $25,000 Consent Denied
☐ 26 Insurance/Subrogation
　　Over $25,000 Consent Denied
☐ 34 Insurance/Subrogation
　　Under $25,000 Consent Denied

### B. PROPERTY TORTS

☐ 01 Automobile
☐ 02 Conversion
☐ 07 Shoplifting, D.C. Code § 27-102 (a)

☐ 03 Destruction of Private Property
☐ 04 Property Damage

☐ 05 Trespass

### C. PERSONAL TORTS

☐ 01 Abuse of Process
☐ 02 Alienation of Affection
☐ 03 Assault and Battery
☐ 04 Automobile- Personal Injury
☐ 05 Deceit (Misrepresentation)
☐ 06 False Accusation
☐ 07 False Arrest
☐ 08 Fraud

☐ 10 Invasion of Privacy
☐ 11 Libel and Slander
☐ 12 Malicious Interference
☐ 13 Malicious Prosecution
☐ 14 Malpractice Legal
☐ 15 Malpractice Medical (Including Wrongful Death)
☐ 16 Negligence- (Not Automobile,
　　Not Malpractice)

☐ 17 Personal Injury- (Not Automobile,
　　Not Malpractice)
☐ 18 Wrongful Death (Not Malpractice)
☐ 19 Wrongful Eviction
☐ 20 Friendly Suit
☐ 21 Asbestos
☐ 22 Toxic/Mass Torts
☐ 23 Tobacco
☐ 24 Lead Paint

SEE REVERSE SIDE AND CHECK HERE _____ IF USED



## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

MELISSA DORNAN
   Vs.                        C.A. No.     2016 CA 001269 B
CAPITAL ONE, NA et al

### INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("SCR Civ") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the Summons, the Complaint, and this Initial Order. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in SCR Civ 4(m).

(3) Within 20 days of service as described above, except as otherwise noted in SCR Civ 12, each defendant must respond to the Complaint by filing an Answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in SCR Civ 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an Initial Scheduling and Settlement Conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than six business days before the scheduling conference date. No other continuance of the conference will be granted except upon motion for good cause shown.

(6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each Judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

Chief Judge Lee F. Satterfield

Case Assigned to: Judge JENNIFER A DI TORO
Date:  February 22, 2016
Initial Conference: 9:30 am, Friday, May 20, 2016
Location:  Courtroom A-47
          515 5th Street NW

Caio.doc

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement. The early mediation schedule shall be included in the Scheduling Order following the ISSC. Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator. Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/. To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. Two separate Early Mediation Forms are available. Both forms may be obtained at www.dccourts.gov/medmalmediation. One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator. Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 2900, 410 E Street, N.W. Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a). If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case. D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code § 16-2826. Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Clerk's Office. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief Judge Lee F. Satterfield

Caio.doc